# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2078

_____

Said Hannoon,

      Plaintiff-Appellant,

v.

Fawn Engineering Corp. and Tony
John Wayne,

      Defendants-Appellees.

\* Appeal from the United States
\* District Court for the Southern
\* District of Iowa.

_____

Submitted: December 9, 2002
Filed: April 14, 2003

_____

Before WOLLMAN, HEANEY, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

      Plaintiff-Appellant Said Hannoon appeals the district court's[1] adverse grant of summary judgment on his claims of harassment and discrimination based on race and

_____

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

national origin.  He also appeals the district court's adverse grant of summary judgment on his state claim of fraudulent representation.  We affirm.

I.

Defendant-Appellee Fawn Engineering Corp. (Fawn) hired Hannoon in September, 1999, to serve as the Information Systems (IS) Manager for Fawn's ailing IS Department.  Before Hannoon was hired, Fawn had fired its prior IS Manager and the situation in the IS Department was described as "out of control" regarding both expenditures and a lack of communication with management.  Hannoon was hired as an at-will employee.  The letter containing his offer of employment stated, "Upon your employment, you will be subject to the terms and conditions as outlined in our employee handbook.  This handbook is available for your review.  Employees of the company are not hired for any set period of time and can be terminated with or without cause at any time or without notice."

In January 2000, Fawn hired Defendant-Appellee Tony John Wayne to serve as its Vice-President of Finance and Chief Financial Officer.  Wayne held supervisory power over the IS Department and, ultimately, over Hannoon.  Before meeting Hannoon, Wayne compiled notes based on a review of Hannoon's personnel file.  In his notes, Wayne identified various concerns as well as questions to ask Hannoon.  These notes included the comments: "hygiene," "first week on job requested Fri. off," "See no formal IT education on his resume," and "3 jobs in 2 years."[2]  Other comments in Wayne's notes related to questions such as "How does he communicate expectations, overall, to his people," and "IT staff meetings?  Who? When?"

_____

[2]The terms information technology (IT) and information services (IS) are used interchangeably throughout the record.  Other than direct quotes, we employ the terms information services and IS.

On February 10, 2000, Wayne met with Hannoon for the first time. Wayne gave Hannoon a series of specific assignments with specific deadlines. Most of these assignments related to the creation of a documented plan of action for the IS department including the creation of job descriptions for IS employees and the development of a policy to restrict the department's reliance and expenditures on outside programmers and IS consultants. During this meeting, Wayne told Hannoon "the rock is bigger than you." Hannoon understood this comment to mean that Wayne thought Hannoon was not fit for the job of IS Manager and that the job of solving problems at the IS department was too big for Hannoon. Wayne memorialized the assignments in a memo dated February 11.

Wayne again met with Hannoon on February 23. During the February 23 meeting, Wayne confronted Hannoon regarding the issue of Hannoon's body odor. Wayne stated that he had noticed the problem, that other employees had complained, and that good interpersonal communication was important to the position of IS Manager. Hannoon responded that a prior employer had reproached him about odor. Hannoon now claims that the prior reproachment related to breath odor rather than body odor. At the time, Hannoon did not voice objection to Wayne's comments. After the meeting, however, Hannoon did object to the comments. He communicated his objections and embarrassment via email to Wayne and other employees.

Later in February, Wayne again met with Hannoon. Wayne memorialized the discussion from this meeting in a memo dated February 28. Under the heading "Written Communication Skills" he noted, "your written communications are difficult to follow and include grammatical errors, tense errors, and are often incomplete. This is an essential element of your job as you have the need to communicate in writing via email, memos and project reports, policy and procedure documents, performance evaluations, etc." Under the heading "Policy and Procedure Documents" he noted that Hannoon may lack necessary experience because the draft documents submitted by Hannoon "read like a detailed standard operating procedure (S.O.P.) as opposed

3

to a clear, specific documentation of authority, accountability, and approved spending guidelines for these decisions." Under the heading "Listening Skills" Wayne noted that Hannoon failed to submit various draft documents that were requested in the February 10 meeting and that Hannoon failed to account for specifically identified information in documents that were submitted. Wayne noted that he was concerned with the breadth and depth of Hannoon's skills, questioned Hannoon's ability to lead a conversion effort, and stated, "[s]pecifically, we are looking to <u>you</u> to help facilitate overall planning and direction, <u>not</u> our outside consultants." (emphasis in original). Finally, under the heading "Leadership Skills" Wayne criticized Hannoon for being too passive in meetings and advised Hannoon that he needed to work to "build relationships with IT staff members and . . . managers."

In memos to Hannoon dated March 24 and 27, Wayne noted that he had not yet received updated documents from Hannoon and reproached Hannoon for not meeting the deadlines set during their first meeting. Hannoon admits that he did not complete the specifically assigned tasks on time. However, in his own defense he states that the assignments were very large and Wayne provided only a very short time for their completion. Further, Hannoon argues that Wayne was partially responsible for the tardiness of Hannoon's work because Wayne received certain revised draft documents but failed to respond between February 24 and March 13.

Hannoon was terminated on April 4, 2000. He brought suit in state court claiming that the defendants discriminated against him, subjected him to harassment in a hostile work environment, and made fraudulent misrepresentations that induced him to accept the job of IS manager. In support of the harassment and discrimination claims, Hannoon points generally to the manner in which he was treated by Wayne and specifically to the comments about body odor as well as the fact that Wayne developed adverse opinions about him before their first meeting. Hannoon argues that Wayne's confrontation regarding body odor and failure to refer Hannoon to Fawn's employee medical assistance program regarding the issue of body odor

4

represent deviations from standard company policy and support an inference of discrimination. Finally, Hannoon alleges that two other facts are relevant to his claims. First, he notes that Wayne forwarded an email from Hannoon to one of Hannoon's subordinates with a request that the subordinate "translate" the email. The email contained various technical terms of art. Second, Hannoon complains that Wayne undermined Hannoon's authority by sending one of Hannoon's subordinates to Canada for training without first consulting Hannoon.

Regarding the issue of fraudulent misrepresentation, Hannoon alleges that he had other employment opportunities available when he accepted the position with Fawn and that he would not have accepted the position with Fawn had he known that it would not be a secure position. Hannoon identifies certain language from a memo between managers at Fawn as evidence that Fawn misrepresented its intentions regarding the IS Manager position. The memo between managers contained a discussion of the severance package to be offered Hannoon. One manager noted, "I know [Hannoon] has not been the best fit, but you and I knew going into it that we were putting a band-aid on the problem." Hannoon alleges fraudulent representation because he was not informed at the time of hiring that his position in the IS Department was viewed as a band-aid or temporary fix.

Hannoon brought suit in state court alleging claims of harassment as well as national origin and race discrimination under Title VII of the Federal Civil Rights Act of 1964 and the Iowa Civil Rights Act (ICRA). In addition, he alleged a claim of fraudulent misrepresentation under Iowa law. Defendants removed to the district court which granted summary judgment on all claims.

## II.

We review the district court's grant of summary judgment de novo, reading the record in a light most favorable to the non-moving party and granting all reasonable

inferences in his favor. <u>Yarborough v. DeVilbiss Air Power, Inc.</u>, 321 F.3d 728, 730 (8th Cir. 2003). Because Hannoon presented no separate arguments under the ICRA, we address his state civil rights claims together with his Title VII claims. <u>See</u> <u>Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n</u>, 322 N.W.2d 293, 296 (Iowa 1982) ("The parties assume we will find federal cases persuasive in selecting the analytical framework for deciding discrimination cases under the Iowa civil rights statute. This assumption is warranted by our prior decisions.") (citations omitted); <u>Vivian v. Madison</u>, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA.") (citation omitted).

Because Hannoon presented no direct evidence of discrimination, we analyze his discrimination claims under the burden shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Under the first step of this analysis, a plaintiff must establish a prima facie case by demonstrating (1) that he is a member of a racial minority, (2) that he was qualified for the relevant position, (3) that there was an adverse employment action, and (4) that some evidence of record supports the inference of improper motivation. <u>Id.</u> If the plaintiff makes this prima facie showing, the defendants must meet a burden of production in the second step to articulate a legitimate, non-discriminatory reason for the adverse employment action. <u>Id.</u> at 802-03. Finally, if the defendants satisfy the second step, the burden returns to the plaintiff in the third step to prove that the defendants' proffered reason is raised merely as a pretext for discrimination. <u>Id.</u> at 804. Within this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant[s] intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000) (quoting <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

In cases where the prima facie case is sufficiently strong, a plaintiff may meet its "ultimate burden" and create a triable issue for the jury by setting forth the prima

facie case and offering evidence to demonstrate that the defendants' proffered reason is pretextual. Reeves, 530 U.S. at 148. One of the Court's rationales for permitting a plaintiff to satisfy its "ultimate burden" merely through a strong prima facie case coupled with a demonstration of pretext is the longstanding principle of evidence that, when a party asserts a false motive for its actions, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id. at 147.

Notwithstanding the importance that the Reeves Court accorded the prima facie case, it remains permissible for lower courts to bypass analysis of the prima facie case where the facts permit easy disposition under a later stage of the McDonnell Douglas test. See Crone v. United Parcel Serv., 301 F.3d 942, 944 (8th Cir. 2002) (assuming the presence of a prima facie case in order to reach the dispositive fact that the plaintiff had not shown the defendant's proffered explanation to be pretextual). The facts of the present case lend themselves to such practice. Hannoon is a Middle-Eastern Arab who was born in Kuwait. He was terminated from the position of IS Manager, and he was replaced in that position by a white male. Accordingly the first, third, and fourth elements of the prima facie case are not in dispute. The parties do, however, dispute the second element, namely, Hannoon's qualifications for the position of IS Manager. We assume for the purpose of summary judgment that Hannoon was qualified and, therefore, that he would be able to demonstrate a prima facie case.

Under the second step of McDonnell Douglas, the defendants easily met their burden of production by alleging poor performance as the legitimate, non-discriminatory basis for Hannoon's termination. Further, although not required (because the burden is merely one of production and not of proof), the defendants provided a detailed and undisputed documentary account of the poor performance.

7

Turning to the third step, we conclude that Hannoon failed to present evidence that would create a genuine question of material fact on the issue of whether the defendants' proffered reason was pretextual. He complains that he was given large assignments with short deadlines, but he admits that the assignments were not completed in the time frame required and he does not argue that the assignments were unreasonable in scope. Further, the other facts Hannoon relies on as evidence of pretext do not indict the veracity of the defendants' proffered reason nor support an inference of discrimination.

First, Hannoon argues that the confrontation concerning body odor demonstrates animus concerning race or national origin. We disagree. Because the comments regarding body odor did not suggest any reference to race or national origin, we are unwilling to hold such comments reasonably capable of supporting an inference of discriminatory intent.

Hannoon attempts to bolster his argument on this point by noting that Wayne did not need to confront him, but rather could have referred him to Fawn's employee medical assistance program. As an initial matter, while we understand that comments from a supervisor to a subordinate concerning the delicate issue of body odor are, no doubt, distressing to all involved, we do not believe that a reasonable jury could find such comments to be race-based, inherently discriminatory, or the type of matter that requires referral to a medical assistance program. Further, there is no evidence that Hannoon's body odor problem was a medical issue rather than merely an issue of personal hygiene.

Second, Hannoon argues that Wayne's notation of the fact that Hannoon had requested Friday afternoons off demonstrates animus regarding race or national origin. Hannoon explains that he requested Friday afternoons off to observe weekly Muslim prayers. This explanation does not refute the defendants' proffered explanation that Hannoon was fired for poor performance nor does it support an

inference of race or national-origin based discrimination. The record indicates that Hannoon was allowed to take Friday afternoons off and was permitted to work at other times to make up for those afternoons. While it is true that Wayne noted Hannoon's request for Friday afternoons off after reading Hannoon's personnel file, there is no indication that defendants considered Hannoon's adjusted schedule as a factor in their decision to terminate his employment. Further, even if Hannoon's adjusted schedule for prayers had been considered, Hannoon alleged discrimination based on race and national origin, not religion, and Hannoon has identified no evidence that would permit the use of religion as a proxy for race.

Finally, viewed collectively or individually, the balance of the specific instances of allegedly discriminatory conduct cited by Hannoon do not involve race or national origin. Rather, they are merely instances of a subordinate employee being subjected to the criticism and control of a supervisor. For example, the comment "the rock is bigger than you," the fact that Wayne sent one of Hannoon's subordinates for training without consulting Hannoon, the fact that Wayne repeatedly criticized Hannoon's leadership and written communication skills, and the fact that Wayne asked one of Hannoon's subordinates to translate a technical email from Hannoon are all race-neutral comments or actions that do not refute the defendants' proffered explanation for Hannoon's termination. Even if we were to believe that a trier of fact could interpret use of the word "translate" as a reference to race or national origin, we agree with the district court and do "not find that criticizing a foreign employee's facility with the English language constitutes discrimination against a particular race or national origin." Hannoon v. Fawn Engr. Corp., No. 4-01-CV-90170 at 7 (S.D. Iowa April 2, 2002). Because these asserted bases for finding pretext fail, we conclude that Hannoon did not generate a triable issue regarding discrimination under Title VII and the ICRA and affirm the district court's grant of summary judgment on these claims.

9

Hannoon also alleged harassment based on the same facts. To prove harassment, Hannoon must establish that:

> (1) he is a member of a protected class; (2) unwelcome harassment occurred; (3) there is a causal nexus between the harassment and his protected-group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) [the defendants] knew or should have known of the harassment and failed to take prompt and effective remedial action.

Robinson v. Valmont Indus., 238 F.3d 1045, 1047 (8th Cir. 2001). Considering the above-alleged instances of discrimination as the alleged instances of harassment, we agree with the district court that these actions and comments comprised criticism rather than harassment. Further, not only do we conclude that no reasonable jury could classify the alleged acts as harassment, we find that Hannoon failed to establish the requisite causal nexus between these alleged instances and his race or national origin. Accordingly, Hannoon's claims of harassment also fail.

Finally, Hannoon's claim of fraudulent representation fails. To prove a claim of fraudulent representation under Iowa law, there must, in fact, be a false representation. Midwest Home Distrib., Inc., v. Domco Indus. Ltd., 585 N.W.2d 735, 738 (Iowa 1998) (listing elements for the common law tort of fraudulent representation under Iowa law). Although some employees at Fawn may have viewed Hannoon as a "band-aid" or temporary fix for the problems in the IS Department, Hannoon cites no false representation made by defendants at the time of his hiring. It is undisputed that he was covered by an employee handbook which, together with an explicit statement in his letter of employment, clearly stated that he was an at-will employee without a guarantee of employment for any set period of time and, in fact, without an entitlement to notice prior to termination. Even if Hannoon had not been clearly informed prior to hire that he was an at-will employee, the fact that some managers may have viewed Hannoon as a "band-aid" does not demonstrate an intent

at the time of hiring to retain Hannoon for only a short period of time. Because Hannoon alleged no false statement, his claim of fraudulent representation under Iowa law fails.

For the reasons set forth above, the district court is affirmed.

A true copy.

Attest.

U.S. COURT OF APPEALS FOR THE EIGHTH CIRCUIT